IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION


CLINT M. STAGG,
      Petitioner,

vs.                                     Case No.:  5:12cv194/RS/EMT

SECRETARY, DEPARTMENT OF CORRECTIONS,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (doc. 1).  Respondent filed an answer and relevant portions of the state court record (doc. 18).  Petitioner filed a reply (doc. 25).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are undisputed and established by the state court record (*see* doc. 18; doc. 25 at 1).[1]  Petitioner was indicted in the Circuit Court in and for Bay County, Florida, Case No. 2006-CF-2629, on one count of first degree premeditated

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (doc. 18).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

murder (Count I) and one count of arson of a vehicle (Count II) (Ex. A at 153–54). Following a jury trial, he was found guilty as charged (Ex. A at 541, Exs. C, D). On February 26, 2008, Petitioner was adjudicated guilty and sentenced to life imprisonment without the possibility of parole on Count I, and a concurrent term of 37.5 months of imprisonment on Count II, with pre-sentence jail credit of 575 days (Ex. A at 556–65, 831–47).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D08-1512 (Ex. F). The First DCA affirmed the judgment per curiam without written opinion on January 5, 2010, with the mandate issuing January 21, 2010 (Ex. H). Stagg v. State, 25 So. 3d 1229 (Fla. 1st DCA 2010) (Table). Petitioner did not seek further review.

On March 4, 2010, Petitioner filed a petition for writ of habeas corpus in the First DCA, Case No. 1D10-747, alleging ineffective assistance of appellate counsel (Ex. I). The First DCA denied the petition on the merits on March 30, 2010 (Ex. J). Stagg v. State, 31 So. 3d 908 (Fla. 1st DCA 2010) (Mem).

On July 22, 2010, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. K at 589–673). The state circuit court denied all but one ground for relief, and ordered an evidentiary hearing on that ground (id. at 713–19, 866–67). Following the evidentiary hearing (Ex. L), the court denied Petitioner's remaining ground for relief (id. at 903–08). Petitioner appealed the decision to the First DCA, Case No. 1D11-1228 (Ex. M). The First DCA affirmed the judgment per curiam without written opinion on May 2, 2012, with the mandate issuing May 30, 2012 (Ex. Y). Stagg v. State, 86 So. 3d 1122 (Fla. 1st DCA 2012) (Table).

Petitioner filed the instant federal habeas action on June 19, 2012 (doc. 1).

II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and

Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.

In relevant part, section 2254(d) now provides:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]   The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

---

[2] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000). In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim. Moreover, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. *See* Henderson v. Campbell, 353 F.3d 880, 890 n. 15 (11th Cir. 2003).

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an

unreasonable application of a legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 786–87, 178 L. Ed. 2d 624 (2011)). The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it. *See* Gill, *supra* at 1291 (citing Harrington, 131 S. Ct. at 786). Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See* Harrington, 131 S. Ct. at 786; *see also* Gill, *supra,* at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits

in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see e.g.* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* Gill, 633 F.3d at 1292. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

III.     PETITIONER'S CLAIMS

A.     Ground One:  "Petitioner contends that the state courts violated clearly established federal law and mandates of the U.S. Constitution when they denied the Petitioner's motion to suppress physical evidence."

Petitioner contends the trial court erred by denying his motion to suppress the physical evidence found by law enforcement after Petitioner disclosed the location of the victim's body during his confession (doc. 1 at 5–8; doc. 25 at 3–10).[3], [4]  Petitioner argues his confession was obtained after he had invoked his right to counsel on July 26, 2006, and law enforcement illegally re-initiated their interrogation on July 30, 2006, in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981), and <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963) (*id.*).  Petitioner asserts the trial court denied the motion to suppress, on the ground that the body would ultimately have been discovered by legal means (*id.*).  He acknowledges there was a <u>possibility</u> the shallow grave housing the body would have been located through legal investigative means, but there was no <u>reasonable probability</u> it would have been discovered, which is the standard the State was required to meet (*id.*).  He contends the state court's decision denying the motion to suppress was based upon an unreasonable determination of the facts, and an unreasonable application of clearly established federal law (*id.*).

Respondent concedes Petitioner exhausted this claim in the state courts by presenting it to the trial court in the motion to suppress, and to the First DCA on direct appeal (doc. 18 at 29).  Respondent contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 29–48).  Respondent contends there is no clearly established federal law requiring application of the exclusionary rule in the circumstances presented here, where there was no police misconduct and thus no reason to invoke the rule's purpose of deterring police misconduct (*id.* at 30–36).  Respondent contends the police re-initiated questioning of Petitioner after receiving erroneous legal advice that they were permitted to do so, because they were questioning him about a crime unrelated to the crime for which he was in custody and had invoked his right to remain silent (*id.* at 30–36).  Respondent additionally contends the inevitable discovery doctrine provided a proper basis for the state court's denial of the motion to suppress (*id.* at 36–48).

---

[3] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

[4] Respondent renumbered this claim as Issue I(a) in its answer (doc. 18 at 29–48).  Petitioner utilizes Respondent's renumbering system in his reply (doc. 25).

Case No. 5:12cv194/RS/EMT

1.     Clearly Established Federal Law

In <u>Miranda v. Arizona</u>, the Supreme Court held:

> when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

384 U.S. at 478–79.

In <u>Edwards v. Arizona</u>, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), the Supreme Court set forth a bright-line rule for questioning that takes place after an accused has requested counsel: once a suspect asserts the right to counsel, not only must the current interrogation cease, but he may not be approached for further interrogation "until counsel has been made available to him," *see* 451 U.S. at 484–85, which means that counsel must be present, *see* <u>Minnick v. Mississippi</u>, 498 U.S. 146, 111 S. Ct. 486, 112 L. Ed. 2d 489 (1990).[5] If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards. *See* <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 177, 111 S. Ct. 2204, 115 L. Ed. 2d 158 (1991). This is "designed to prevent police from badgering a defendant into waiving his previously asserted <u>Miranda</u> rights." <u>Michigan v. Harvey</u>, 494 U.S. 344, 350, 110 S. Ct. 1176, 108

---

[5] Subject to waiver analysis, the <u>Edwards</u> rule may not apply, however, where it is the suspect who re-initiates the discussion in the absence of counsel. *See* <u>Oregon v. Bradshaw</u>, 462 U.S. 1039, 1044–47, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983).

L. Ed. 2d 293 (1990). The rule is not offense specific: once a suspect invokes the <u>Miranda</u> right to counsel for interrogation regarding one offense, he may not be re-approached regarding any offense unless counsel is present. *See* <u>Arizona v. Roberson</u>, 486 U.S. 675, 108 S. Ct. 2093, 100 L. Ed. 2d 704 (1988).

In <u>Nix v. Williams</u>, 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984), the Supreme Court adopted the inevitable discovery exception to the exclusionary rule. 467 U.S. at 448. The Court held that when the evidence in question would inevitably have been discovered without reference to the police error or misconduct upon which a defendant seeks to suppress the evidence, there is no nexus sufficient to provide a taint, and the evidence is admissible. *Id.* To satisfy the inevitable discovery exception, the prosecution must establish by a preponderance of the evidence that the information would have ultimately been recovered by lawful means. *Id.* at 444 & n.5.

        2.      Federal Review of State Court Decision

Petitioner raised the suppression issue in the trial court (Ex. A at 169–70, 235–45, 380–83). A suppression hearing was held (Ex. B). The court adjudicated the issue as follows:

> The Defendant has moved for an order suppressing his statement and all evidence—including his victim's body—gathered as a result of that statement. Clint Stagg is accused of killing his drug dealer, Tonya Farmer. She went missing. Her truck was found burned.[6] The Defendant became a suspect and was arrested for arson. When questioned, the Defendant invoked his right to a lawyer and was held subject to a bond.

> The investigation into the disappearance of Tonya Farmer caused the Sheriff's Department investigators to focus on the Defendant. They wanted to talk to the Defendant, but they knew he had invoked his right to counsel. They sought legal advice. They were told the invocation of the right to counsel in case specific. They were told not to discuss the arson but that they could discuss the disappearance of Tonya Farmer.[FN 1] After being advised of his rights, the Defendant spilled his guts. He told what happened and where to find the body.

> [FN 1: In 1992, Florida's Supreme Court considered the application of *Miranda* in light of Article I, Section 9 of the *Florida Constitution* setting out a very plain and understandable general rule: "Once a

---

[6] The state court incorrectly stated that the burned truck was the victim's, when it was in fact Petitioner's. This incorrect finding was irrelevant to the court's determination of the suppression issue.

suspect has requested the help of a lawyer, no state agent can reinitiate interrogation **on any offense** throughout the period of custody unless the lawyer is present . . . ."  See *Traylor v. State*, 596 So. 2d 957 (Fla. 1992).

Counsel for the Defendant argues that the investigator violated the Defendant's right to an attorney **as he requested** and that the exclusionary rule should be applied.  The State concedes the error in questioning the Defendant but argues that the evidence thereafter found would have been discovered in due course and that the State should not be deprived of the proof that Tonya Farmer was murdered.

The Sheriff's Office had independently begun to search two areas.  The Defendant had buried the body in a shallow grave miles from either site.  Nevertheless, the State argues that it would have found the victim's remains sooner or later without the Defendant's help.

Tonya Farmer was buried just inches below the surface in a pine forest several yards off a county road between the two search sites; in fact, some evidence was visible before any digging commenced.  The evidence before the Court is that the Sheriff's Department has a record of success in finding bodies, particularly those interred in shallow graves.  Coyotes and other wildlife dig up poorly buried remains releasing the recognizable odor of a decomposing body.  Someone would smell it.  Moreover, although the gravesite was in a forest it was very close to the roadway.  It was also an area of anticipated forestry work.  Most importantly, it was in an area frequented by members of a hunt club; a tree stand was nearby; and club members have since chased a buck right over the grave site.[FN 2]

> [FN 2:  Although not included in the evidence, the Court is aware that the Sheriff maintains a mounted posse that is used in body searches.  Additionally, the photos in evidence depict a sandy circular patch in the otherwise wooded area at the grave site that would surely draw the attention of the Sheriff's helicopter pilot.]

The Exclusionary Rule has long been criticized because it deprives law enforcement of evidence based on a "technicality."  The rule, originally justified as the most effective tool to deter police misconduct, has been used for the suppression of evidence on ground on which good **lawyers** can disagree even when there is **no** police "misconduct."  That is the case here.  The Sheriff's investigators prudently sought counsel first and adhered to the instructions they were given.  There was no police misconduct.  The initial purpose of the rule has no application here.

There is yet another reason why the exclusionary rule should not apply. In *Nix v. Williams*, 104 S. Ct. 2501 (1984), the U.S. Supreme Court considered the question of whether the prosecution should be deprived of evidence that would have been found **without the objectionable statement**. The rule there announced is:

> If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means—here the volunteers' search—then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense.

That rule should apply in this case. It is therefore

**Adjudged** that the Defendant's statements made to investigators while incarcerated after his arrest for arson shall not be admissible as evidence in the trial of this cause; it is further

**Adjudged** that the physical evidence found by the Sheriff's investigators at the grave site would ultimately and inevitably been found by lawful means and therefore are admissible at trial.

(Ex. A at 384–85). Petitioner raised the issue on direct appeal of his conviction (Ex. E). The First DCA affirmed per curiam without written opinion (Ex. H).

In applying Williams, the Eleventh Circuit and several other circuit courts have held that to satisfy the inevitable discovery exception, the prosecution must establish by a preponderance of the evidence that (1) there was a reasonable probability the evidence would have ultimately been recovered by lawful means, and (2) "the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." United States v. Virden, 488 F.3d 1317, 1322 (11th Cir. 2007); *see also* United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997); United States v. Thomas, 955 F.2d 207, 210–11 (4th Cir. 1992); United States v. Buchanan, 904 F.2d 349, 356 (6th Cir. 1990); United States v. Cherry, 759 F.2d 1196 (5th Cir. 1985).

Initially, Petitioner failed to show by clear and convincing evidence that the state court's factual findings were unreasonable. At the suppression hearing in this case, Captain Jimmy Stanford testified concerning specific details of the situs of the searches and the intentions of the searchers (Ex. B at 623–628, 641–47). Captain Stanford testified the body was discovered 2.1 miles south of

Highway 231 (which runs east-west) (*id.* at 641). He testified it was located 95 feet from the edge of the roadway of Highway 388 (which runs north-south) and 40–50 feet inside the wood line of pine trees in that area (*id.*). He testified that the house closest to the grave site was one-half mile from it (*id.*). Stanford further testified that the grave site was 15–20 miles from one area of the search, the "Tram Road" search, where searchers had found one of the victim's hair extensions and evidence of glass she had recently purchased (*id.* at 642). He testified the grave site was 10–15 miles from another search area in the opposite direction, which was near Petitioner's home and the site of the arson (*id.* at 642–43).

Captain Stanford testified that based upon his training and experience, he believed law enforcement would have been discovered the body without Petitioner's cooperation (Ex. B at 627). He testified that the entire Sheriff's Office and other area law enforcement agencies were committed to finding the victim (*id.*). He stated they were following all leads, interviewing everyone, and "we would not have rested until we found her. . . . we were in for the long haul." (*id.*). Captain Stanford also testified he had experience in the Sheriff's Office with other cases in which bodies were buried in rural areas and discovered by citizens and/or law enforcement (*id.* at 628–32). He discussed five specific examples of such discoveries from 1993 to 2005 (*id.*). Captain Stanford testified that in all of the missing person cases from 1993 to 2007, there were only two (2) in which the person was not found, and in one of those cases it was unclear whether the person left the area voluntarily or was the victim of foul play (*id.* at 646).

Defense counsel questioned Captain Stanford about whether law enforcement would have searched the area of the grave site without Petitioner's telling them the body was there:

> Q.      Can you, can you single out anything to me, as far as this particular site that you had as a lead that was going, that you would have searched that area absent Mr. Stagg's statement?
>
> A.      I don't have anything to say that [sic]. I can say that had we not found Ms. Farmer, we would have continued to look and continued to develop evidence and, and I feel certain that we would have found her.
>
> Q.      But as to the, as to the investigation up until the point when you went and spoke to Mr. Stagg, you didn't have any specific piece of evidence that pointed to that particular area, wouldn't that be a correct statement?

A.      That would be correct.

Q.      And as far as you had, you had indicated on direct that you believe you would have found it, did you have a specific plan in place where you had already issued orders for, for the kind of specific search for Ms. Farmer before you went and spoke to Mr. Stagg, such as the two that had happened before?

A.      We had, the searches we were doing were driven by evidence that we were gathering in the case.

Q.      But at that time that you went and spoke to Mr. Stagg, you didn't have a specific search that you were, had planned at that point? You had already completed any searches?

A.      That is incorrect, no. We had searched those areas, we were going to continue to search from his house and the other site because we felt sure the Tram Avenue was a, had something to do with this because of the hair extensions and the glass being broke there, so we know something occurred there. We would have continued to search those areas and eventually converged in that area. We hadn't used all of our resources yet in our search.

Q.      I understand that part, because what I'm getting at is we've got the two areas that were searched, but absent those two areas, did you have any other area that you were preparing to search before you came and spoke to Mr. Stagg?

A.      Yes. We were, were continuing, we were going to continue from those areas. The one on Tram Road, we would continued [sic] going north. The areas near his home, we would continue going south. Unless we would got [sic] some new evidence, which would have led us somewhere else. So our search parties were continuing. We weren't, we didn't search these two areas and go home and watch TV, we were continuing to search until we found her.

Q.      But when you approached Mr. Stagg, you were still searching those same two areas?

A.      We were still searching, we were still working this case.

Q.      And there wasn't a third area that you were preparing to search when you went to see Mr. Stagg to speak with him?

A.      What do you mean by third area?

Q.      You said that you were continuing to search in those areas?

A.    No, we were expanding our search from those areas.  We had searched those areas, there was no need for us to search those areas again.  We had searched those areas.  We would have continued to search, we would have expanded our search from those areas.  I'm sorry if I'm confusing you.  We've already searched those areas, we wouldn't have re-searched those areas.  We would have expanded our search from those areas barring any new evidence that we gathered, which may have led us somewhere else.

Q.    But at the time point in time [sic] you were speaking to Mr. Stagg, you didn't have any, any lead that pointed you to any other specific area than what had already been searched?

A.    No.

(Ex. B at 643–45).

Captain Stanford testified that the circumstances of the grave site itself supported his belief that the body would have inevitably been discovered (Ex. B at 627–28).  He testified the victim's hair extension was sticking out of the ground (*id.* at 625).  He testified the grave was shallow, and the earth was already settling and cracks in the earth were appearing just four days after the victim was buried (*id.* at 626).  He testified the top of the victim's body was less than a foot from the surface, and he felt certain the victim's body would have been unearthed shortly (*id.* at 626, 647).  Captain Stanford testified that due to the shallowness of the grave, animal activity would have begun shortly, and someone would have discovered the grave (*id.* at 628).  He testified the grave site was located on property managed by people who went to that area quite often (*id.*).  He also testified that the property was part of a hunting lease, and hunters often hunted that area (*id.*).

Glenn Cooper testified he was president of the Moccasin Creek Hunt Club (Ex. B at 665–74).  He testified that the club leased the property upon which the grave site was discovered (*id.*).  Cooper testified he was "about a hundred percent" certain that members of the hunt club would have discovered the shallow grave (*id.* at 671).

Flint Norris, another member of the hunt club, testified that the six-acre area in which the grave site was located was a deer crossing and an active hunting area (Ex. B at 674–77).  He testified that  six (6) months after the grave site was discovered, hunters tracked a deer that walked nearly directly over the grave (*id.* at 678).  He testified that if the body had remained in the shallow grave, it would have been discovered:

Q.      Now, you say that you've actually been out there to the site.  Mr. Norris, do you believe, based on your experience up there with hunting club, that if Ms. Tanya [sic] Farmer's body had remained in the ground in that shallow grave, that it would have been discovered by either you or some of the other members of your hunting club, sir?

A.      I do.
. . . .

Q.      And why is it that you believe that body would have been discovered, sir by someone in your hunting club or one of their guests?

A.      Well, like I say, about fifteen or twenty times a year, we, there would have ben a vehicle that would have been parked within a hundred, between fifty and a hundred yards of that area.  And, you know, for whatever reason, based on the events of that one particular day where we tracked a deer that walked in the woods right there.

Q.      Right there at that place?

A.      Exactly.

(Ex. B at 679–80).

The facts of the instant case are similar to the facts faced by the Supreme Court in Nix v. Williams.  The ten-year old victim in Williams disappeared from a YMCA building in Des Moines, Iowa.  467 U.S. at 434.  Shortly after she disappeared, Williams was seen leaving the YMCA carrying a large bundle wrapped in a blanket; a fourteen–year–old boy who had helped Williams open his car door reported that he had seen "two legs in it and they were skinny and white."  *Id.* Williams' car was found the next day 160 miles east of Des Moines in Davenport, Iowa.  *Id.*  Later, several items of clothing belonging to the child, some of Williams' clothing, and an army blanket like the one used to wrap the bundle that Williams carried out of the YMCA were found at a rest stop on Interstate 80 near Grinnell, between Des Moines and Davenport.  A warrant was issued for Williams' arrest.  *Id.* at 434–35.

Police surmised that Williams had left the child's body somewhere between Des Moines and the Grinnell rest stop where some of the child's clothing had been found.  *Id.*  at 435.  On December 26, the Iowa Bureau of Criminal Investigation initiated a large-scale search.  *Id.*  Two hundred (200) volunteers divided into teams began the search 21 miles east of Grinnell, covering an area several

miles to the north and south of Interstate 80. *Id.* They moved westward from Poweshiek County, in which Grinnell was located, into Jasper County. *Id.* Searchers were instructed to check all roads, abandoned farm buildings, ditches, culverts, and any other place in which the body of a small child could be hidden. *Id.*

Meanwhile, Williams surrendered to local police in Davenport, where he was promptly arraigned. *Id.* Williams contacted a Des Moines attorney who arranged for an attorney in Davenport to meet Williams at the Davenport police station. *Id.* Des Moines police informed counsel they would pick Williams up in Davenport and return him to Des Moines without questioning him. *Id.* Two Des Moines detectives then drove to Davenport, took Williams into custody, and proceeded to drive him back to Des Moines. *Id.* During the return trip, one of the policemen, Detective Leaming, began a conversation with Williams, which led to Williams' agreeing to direct officers to the child's body. *Id.* at 436.

At the suppression hearing, the prosecution offered the testimony of Agent Ruxlow of the Iowa Bureau of Criminal Investigation. Ruxlow had organized and directed the 200 volunteers who were searching for the child victim's body. *Id.* at 448. The searchers were instructed "to check all the roads, the ditches, any culverts. . . . If they came upon any abandoned farm buildings, they were instructed to go onto the property and search those abandoned farm buildings or any other places where a small child could be secreted." *Id.* at 449. Ruxlow testified that he marked off highway maps of Poweshiek and Jasper Counties in grid fashion, divided the volunteers into teams of four to six persons, and assigned each team to search specific grid areas. *Id.* Ruxlow also testified that, if the search had not been suspended because of Williams' promised cooperation, it would have continued into Polk County, using the same grid system. *Id.* Although he had previously marked off into grids only the highway maps of Poweshiek and Jasper Counties, Ruxlow had obtained a map of Polk County, which he said he would have marked off in the same manner had it been necessary for the search to continue. *Id.*

The search had commenced at approximately 10:00 a.m. and moved westward through Poweshiek County into Jasper County. *Id.* At approximately 3:00 p.m., after Williams had volunteered to cooperate with the police, Detective Leaming, who was in the police car with Williams, sent word to Ruxlow and the other Special Agent directing the search to meet him at the

Grinnell truck stop and the search was suspended at that time. *Id.* Ruxlow also stated that he was "under the impression that there was a possibility" that Williams would lead them to the child's body at that time. *Id.* The search was not resumed once it was learned that Williams had led the police to the body, which was found two and one-half miles from where the search had stopped in what would have been the easternmost grid to be searched in Polk County. *Id.* There was testimony that it would have taken an additional three to five hours to discover the body if the search had continued; the body was found near a culvert, one of the kinds of places the teams had been specifically directed to search. *Id.*

> The Court ruled:

> On this record it is clear that the search parties were approaching the actual location of the body, and we are satisfied, along with three courts earlier, that the volunteer search teams would have resumed the search had Williams not earlier led the police to the body and the body inevitably would have been found.

*Id.* at 450.

Here, there was evidence that the searches from opposite directions of the actual location of the body were being expanded by law enforcement and would have converged at the grave site. Additionally, there was evidence that the conditions of the grave site (its shallowness and the fact that a hair extension was poking out of it, which was a specific type of evidence searchers had already gathered and thus were on the look-out for) were such that the body would have been unearthed shortly. Further, there was evidence of active hunting in the specific area of the grave site. It is possible that fairminded jurists could disagree that the state court's adjudication of Petitioner's claim is inconsistent with Williams; however, that possibility only demonstrates that Petitioner is not entitled to federal habeas relief. *See* Morton v. Sec'y, Dep't of Corr., 684 F.3d 1157, 1166 (11th Cir. 2012) ("[W]e may issue a writ of habeas corpus only 'where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'" (quoting Harrington, 131 S.Ct. at 786)). Because Petitioner failed to show that the state court's adjudication of the suppression issue was based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of Williams, he is not entitled to relief on this claim.

B.     Ground One (a):  "The state court erred in denying Petitioner's motion to exclude the testimony of Dina Stagg Lopes in violation of Petitioner's constitutional right to a fair trial under the Sixth Amendment to the United States Constitution as well as due process under the 14th Amendment."

Petitioner abandoned this claim (doc. 25 at 10–11).[7]

C.     Ground Two:  "Petitioner contends he was denied effective assistance as afforded by the Sixth Amendment to the U.S. Const., when trial counsel failed to file a timely demand for speedy trial, notice of expiration of speedy trial, motion to dismiss and motion for discharged [sic], and waiving Petitioner's speedy trial right without his consent."

        Ground Two (a):  "Denied effective assistance for failing to file a timely notice of expiration of speedy trial."

        Ground Two (b):  "Denied effective assistance based on counsel's failure to file a motion to dismiss and motion for discharge following the notice of expiration of speedy trial."

        Ground Two (c):  "Ineffectiveness for waiving Stagg's speedy trial right without his consent."

Petitioner abandoned these claims (doc. 25 at 10–11).[8]

D.     Ground Two (d):  "Denied effective assistance for counsel's failure to have inform [sic] Petitioner of his right to be present at all critical stages."

Petitioner contends defense counsel was ineffective for failing to inform him of his right to be present at all critical stages of trial, as set forth in Ground Two of his Rule 3.850 motion (doc. 1 at 15–19; doc. 25 at 11–13).  Ground Two of Petitioner's Rule 3.850 motion included three subclaims:  (1) defense counsel failed to inform him he had the right to be present in the jury assembly room when the jury was sworn and his trial formally commenced; (2) counsel failed to object to the use of an electronic stun belt which prevented Petitioner from being present at the bench during sidebar conferences during jury selection, when counsel exercised juror challenges; and (3) counsel failed to request Petitioner's presence during a sidebar conference when Juror Jordan was questioned about her exposure to publicity about the trial (Ex. K at 617–28).

_____

[7] The parties renumbered this claim as Issue I(b) (doc. 18 at 48–58; doc. 25 at 10–11).

[8] The parties consolidated and renumbered these claims as Issue II (a), (b), (c) (doc. 18 at 58–66; doc. 25 at 11).

Respondent contends the state court's adjudication of Petitioner's claims is entitled to deference (doc. 18 at 66–69).

### 1. Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15).  Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so.  Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).  Counsel's performance is deficient only if it is "outside the wide range of professional competence."  Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").  "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317).  Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict

the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting <u>Putman v. Head</u>, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the <u>Strickland</u> standard, Petitioner's burden of demonstrating prejudice is high. *See* <u>Wellington v. Moore</u>, 314 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting <u>Strickland</u>, 466 U.S. at 693). However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome. <u>Strickland</u>, 466 U.S. at 693–94. Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694. Indeed, it would be "contrary to" the law clearly established in <u>Strickland</u> for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence. <u>Williams v. Taylor</u>, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. <u>Strickland</u>, 466 U.S. at 694–95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), <u>Strickland</u> prejudice is gauged against the outcome of the trial, not on appeal. *See* <u>Purvis v. Crosby</u>, 451 F.3d 734, 739 (11th Cir. 2006) (citing <u>Strickland</u>, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. <u>Strickland</u>, 466 U.S. at 698; <u>Collier v. Turpin</u>, 177 F.3d 1184, 1197 (11th Cir. 1999).

2.    Federal Review of State Court Decision

Petitioner raised this claim as Ground Two in his Rule 3.850 motion (Ex. K at 617–28).  In the state circuit court's written decision denying this claim, as well as several other claims of ineffective assistance of counsel, the court did not expressly cite <u>Strickland</u> (Ex. K at 713–19).  However, the court analyzed Petitioner's claims by determining whether he had shown that counsel's performance was deficient, and that he was prejudiced by counsel's alleged errors (*id.*).  Further, in a subsequent order denying another of Petitioner's ineffective assistance of counsel claims (Ground Three, which was the subject of the evidentiary hearing), the state court cited <u>Strickland</u> (*id.* at 904).  This record is sufficient to establish that the state court applied the correct legal standard to Petitioner's ineffective assistance of counsel claims.

The state court adjudicated this particular claim as follows:

> In Ground Two, the Defendant argues that trial counsel was ineffective for failing to inform him of his right to be present at all critical stages of his case.  In particular, the Defendant alleges that he had a right to be present in the jury room where the jury was sworn.  Also, the Defendant alleges that he was not present for juror challenges and a sidebar conference involving a juror's news exposure.
>
> A defendant has the right to be present at all critical stages of trial, including the swearing of the jury for voir dire.  *See Anderson v. State*, 18 So. 3d 501(Fla. 2009).  However, the act or omission of counsel preventing the defendant's presence must be prejudicial in order for the defendant to prevail on his 3.850 motion.  *See Lott v. State*, 826 So. 2d 457, 459 (Fla. 1st DCA 2002).  In this case, the Defendant merely asserts that, had counsel requested the Defendant's presence, the Judge would have allowed it, "thus providing [the Defendant] the opportunity to meaningfully participate . . . ."  Further, the Defendant asserts that had an objection been made as to his absence, the error would have be [sic] preserved for appeal, presented, and won.  The Defendant's plain assertions do not demonstrate how his absence prejudiced him or affected the validity of trial.  *See Orme v. State*, 896 So. 2d 725, 738 (Fla. 2005); *see also Wike v. State*, 813 So. 2d 12, 20–21 (Fla. 2002).
>
> The Defendant also alleges that counsel was ineffective for [failing to] object[ ] to the use of an electronic stun belt, which prevented him from participating in peremptory challenges and a side-bar conference concerning a juror's pretrial publicity exposure.  The Defendant states that he did not want to walk in front of the jury because of the perception the stun belt would give them.  Rule 3.180 states that the Defendant is present if he is "physically in attendance for the courtroom proceeding, and has a meaningful opportunity to be heard *through counsel* on the issues being discussed."  Fla. R. Crim P. 3.180(b) (emphasis added).  Before peremptory challenges were made, trial counsel indicated that the Defendant waived

his right to be present at sidebar, and even consulted with the Defendant before agreeing to the final jury panel. (*See* Jury Selection Transcripts at 117–122.) Therefore, Defendant was able to meaningfully participate through counsel. *See Lamarca v. State*, 931 So. 2d 838, 856 (Fla. 2006).

Further, his absence at the sidebar conference regarding pretrial publicity was not prejudicial. The Defendant alleges that he would have instructed counsel to move to strike Juror Jordan for cause, as the juror gave inconsistent answers when asked if she had read a news report about the proceedings. Had the Judge denied this request, the Defendant claims that he would have instructed trial counsel to use one of the remaining peremptory challenges. The record is not clear as to whether the Defendant was actually absent during this sidebar conference; however, trial counsel was present. As the "meaningful opportunity to participate" can be satisfied through counsel, the Defendant's claim is denied. *Id.*

(Ex. K at 714–15). Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. N).

A criminal defendant's constitutional right to be present at all critical stages of the proceedings is rooted in the Confrontation Clause of the Sixth Amendment, but the Supreme Court has recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him. *See* United States v. Gagnon, 470 U.S. 522, 526, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985) (citation omitted). In Snyder v. Massachusetts, 291 U.S. 97, 54 S. Ct. 330, 78 L. Ed. 674 (1934), the Court explained that a defendant has a due process right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge . . . . [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Id.* at 105–06. Although the Court has emphasized that this privilege of presence is not guaranteed "when presence would be useless, or the benefit but a shadow," *id.* at 106–07, due process clearly requires that a defendant be allowed to be present "to the extent that a fair and just hearing would be thwarted by his absence," *id.* at 108. Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding "that is critical to its outcome if his presence would contribute to the fairness of the procedure." Kentucky v. Stincer, 482 U.S. 730, 745, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987).

In <u>Gagnon</u>, the Supreme Court applied this rule to defendant Gagnon's argument that his constitutional right to be present at all critical stages was violated when he was not present during an in camera discussion between the trial judge, counsel for the parties, and a juror, regarding the juror's concern that Gagnon was sketching portraits of the jury. The Court analyzed Gagnon's due process argument as follows:

> In this case the presence of the four [defendants] and their four trial counsel at the *in camera* discussion was not required to ensure fundamental fairness or a "reasonably substantial . . . opportunity to defend against the charge." *See* <u>Snyder</u>, *supra*. The encounter between the judge, the juror, and Gagnon's lawyer was a short interlude in a complex trial; the conference was not the sort of event which every defendant had a right personally to attend under the Fifth Amendment. [Defendants] could have done nothing had they been at the conference, nor would they have gained anything by attending. *Id.* at 108, 54 S. Ct. at 333. Indeed, the presence of Gagnon and the other [defendants], their four counsel, and the prosecutor could have been counterproductive. Juror Graham had quietly expressed some concern about the purposes of Gagnon's sketching, and the District Judge sought to explain the situation to the juror. The Fifth Amendment does not require that all the parties be present when the judge inquires into such a minor occurrence.

<u>Gagnon</u>, 470 U.S. at 527.

In <u>Stincer</u>, the Supreme Court applied <u>Snyder</u> and <u>Gagnon</u> in determining whether defendant Stincer's due process rights were violated by his exclusion from a hearing to determine the competency of two child witnesses to testify. 482 U.S. at 745. The Court noted that neither witness was questioned about the substantive testimony she would have given during trial; rather, each witness was questioned about her ability to recollect and narrate facts, her ability to distinguish between truth and falsehood, and her sense of moral obligation to tell the truth. *Id.* at 745–46. The hearing thus did not bear a substantial relationship to the defendant's opportunity to better defend himself at trial. *Id.* at 746. The Court further noted that Stincer gave no indication that his presence would have been useful in ensuring a more reliable determination of the witness's competency; he presented no evidence that his relationship with the children, or his knowledge of facts regarding their background, could have assisted either his counsel or the judge in asking questions that would have resulted in a more assured determination of competency. *Id.* at 747. The Court concluded that in the absence of any indication that Stincer "could have done [anything] had [he] been at the

[hearing] nor would [he] have gained anything by attending," his exclusion from the competency hearing did not violate his due process rights. *Id.* (quoting <u>Gagnon</u>, 470 U.S. at 527).

With regard to Petitioner's claim that he had a right under Florida law to be present when potential jurors were sworn for voir dire, the Florida Supreme Court has rejected this argument and held that the general juror qualification process prior to voir dire is not a critical stage requiring the defendant's presence. *See* <u>Anderson v. State</u>, 18 So. 3d 501, 522 (Fla. 2009) (citing <u>Robinson v. State</u>, 520 So. 2d 1, 4 (Fla. 1988)). Further, the transcript of jury selection demonstrates that Petitioner was present in the courtroom during jury selection and when the selected jury panel was sworn in open court (Ex. C at 729, 803, 822–25). This satisfied the Florida requirement that he be present when the jury is sworn. *See* <u>Anderson</u>, 18 So. 3d at 522. Moreover, he failed to show that federal due process concerns were violated by his absence from the swearing of the jury pool. He has not shown that his presence at the swearing would have rendered jury selection more fair and just. Therefore, Petitioner cannot show defense counsel was deficient for failing to request or facilitate Petitioner's presence when the jury pool was sworn.

Petitioner next asserts that had he been present at bench conferences during which counsel exercised juror challenges, he would have suggested that two jurors, Juror Hawkins and Juror Jordan, be struck for cause, or that defense counsel use peremptory challenges to strike them (doc. 25 at 11–13). He asserts Juror Hawkins expressed her belief that it was Petitioner's burden to prove his innocence, and Juror Jordan disclosed she read about Petitioner in a newspaper article which painted Petitioner in an unfavorable light (*id.*). Petitioner asserts his absence from the bench conferences resulted in the seating of two biased jurors, who had preconceived notions as to his guilt.

Petitioner failed to show that his absence from the bench when counsel exercised juror challenges had any effect on the outcome of the proceeding. He alleges he would have struck Juror Hawkins, because she expressed a belief that it was Petitioner's burden to prove his innocence. The transcript of jury selection demonstrates that Petitioner was present during all of the questioning of the jurors, including when Ms. Camille Hawkins initially expressed confusion as to the burden of proof, but, upon further questioning, stated she would follow the judge's instruction that the State was required to overcome the presumption of Petitioner's innocence by proving his guilt, and

Petitioner did not have to say or do anything in the process (Ex. C at 806–08). The transcript also demonstrates Ms. Hawkins was among the first seven (7) potential jurors considered for the panel (*id.* at 733, 819). Defense counsel did not challenge Ms. Hawkins, and prior to defense counsel's accepting the panel, including Ms. Hawkins, he conferred with Petitioner (*id.* at 819–20). Petitioner does not allege he communicated to defense counsel his objection to Ms. Hawkins, or that defense counsel otherwise accepted the panel contrary to his wishes. Indeed, at the post-conviction evidentiary hearing on another claim (discussed *infra*), Petitioner admitted he never told counsel he did not want Juror Hawkins on the jury (*see* Ex. L at 952–53, 965–67). Therefore, he failed to show that his absence from the bench during the exercise of juror challenges had any negative effect on the defense.[9]

With regard to the bench conference during which the trial judge questioned Juror Jordan about her exposure to pre-trial publicity, Petitioner failed to show that his absence thwarted a fair and just hearing of that issue. *See* <u>Snyder</u>, 291 U.S. 107–08 ("So far as the Fourteenth Amendment is concerned, the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only."). Petitioner's jury was selected on a Friday, and prior to excusing them for the weekend, the trial judge advised them that media reports concerning the case would be published over the weekend, and he instructed the jurors not to listen to or read any of the reports (Ex. C at 828). When trial reconvened the following

---

[9] Even if Petitioner claimed error with respect to counsel's failure to strike Ms. Hawkins (which he does not), Petitioner's allegations fail to show counsel was ineffective for failing to strike Ms. Hawkins. *See, e.g.*, <u>Bell v. United States</u>, 351 F. App'x 357, 359–60 (11th Cir. 2009) (unpublished) (trial counsel was not ineffective for failing to move the court to strike a juror for cause, exercise a peremptory strike, or at least revisit her indication of possible impartiality in defendant's trial for drug-related charges; although juror first indicated during individual questioning that she was not sure she could presume a defendant's innocence if the offense involved drugs and the court brought up the juror as a possible for cause challenge, subsequent to her initial expression of uncertainty, multiple other questions and answers during voir dire, plus the court's instructions to the venire, established that the juror could be impartial, and the record showed that trial counsel made an express decision to accept the juror); <u>Hunter v. Sec'y for Dep't of Corr.</u>, 318 F. App'x 856, 858–59 (11th Cir. 2009) (unpublished) (habeas petitioner failed to establish that defense counsel's failure to strike juror, who responded "I think so" when asked whether she would be able to follow the court's instructions during trial, and stated she would "try" to follow the law as instructed, was unreasonable, where juror subsequently affirmed she could follow the judge's instructions; she exhibited no bias against petitioner; and she expressed that she was capable of applying the law as instructed by the court).

Tuesday, each juror was questioned at side bar regarding his or her exposure to media reports over the weekend (Ex. D at 5–10).[10]  During Juror Jordan's side bar, the following exchange occurred:

> THE COURT:  Remember on Friday I said there was a newspaper reporter here and in the courtroom and I asked everybody not to read the newspaper?
>
> A [by Juror Jordan]:  Uh-huh.  (Yes).
>
> THE COURT:  Were you able to follow my instructions did not [sic] read the newspaper.
>
> MS. JORDAN:  Um, I actually read just a little bit of it in the paper, yeah.
>
> THE COURT:  Did you read that article?
>
> MS. JORDAN:  No.  My husband did but I didn't.
>
> THE COURT:  Okay, so you didn't read it?
>
> MS. JORDAN:  He saw it in the paper.
>
> THE COURT:  Did he say anything to you about that article?
>
> MS. JORDAN:  No, I haven't talked to him about it.
>
> THE COURT:  Okay, very good.
>
> MS. JORDAN:  No.  I haven't talked to anybody.
>
> THE COURT:  Okay.  That's real good, thank you for following my instructions.

(Ex. D at 7–8).  Juror Jordan thus admitted she failed to follow the court's instruction to not read the newspaper, but upon further questioning, clarified that she did not read the article about Petitioner's case, nor did she obtain any information from her husband, who read the article.  Both the prosecutor and defense counsel were present during the judge's questioning of Juror Jordan (*id.* at 5–11).

Petitioner failed to show that his presence during the individual questioning of Juror Jordan would have revealed actual misconduct or any other basis for removing her from the panel, or that

---

[10] Defense counsel had requested this procedure (*see* Ex. C at 724–27).

his presence would have otherwise contributed to the fairness of the proceeding.  Therefore, he failed to show that defense counsel's failure to include him at side bar was deficient, or that the defense was prejudiced by his absence.  *See* United States v. Willis, 759 F.2d 1486, 1500 (11th Cir. 1985) (rejecting claim that defendants had right to be present during individual voir dire of jurors as to any prejudgments they might have made about defendants' guilt based upon pre-trial publicity, where defense counsel was present, and defendants failed even to suggest any prejudice arising from their absence).

Moreover, the state court rejected Petitioner's contention his absence from the side bar conferences at issue violated Rule 3.180 of the Florida Rules of Criminal Procedure.[11]  The state court determined that no violation of Rule 3.180 occurred, because Petitioner was able to meaningfully participate through counsel.  This court must abide by the state court's interpretation of state law.  *See* Bradshaw v. Richey, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005); Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975).  In the absence of a violation of Rule 3.180, Petitioner cannot show that counsel was ineffective for failing to assert his rights under the rule.

Petitioner failed to demonstrate that the state court's adjudication of his claim regarding counsel's failure to advise him of his right to be present at all critical stages of the trial was based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of Strickland.  Therefore, he is not entitled to relief on this claim.

---

[11] Rule 3.180 provides, in relevant part:

**(a) Presence of Defendant.**  In all prosecutions for crime the defendant shall be present:
. . . .
(4) at the beginning of the trial during the examination, challenging, impanelling, and swearing of the jury;

(5) at all proceedings before the court when the jury is present;
. . . .
**(b) Presence; definition.**  A defendant is present for purposes of this rule if the defendant is physically in attendance for the courtroom proceeding, and has a meaningful opportunity to be heard through counsel on the issues being discussed.

Fla. R. Crim. P. 3.180(a), (b).

Case No.  5:12cv194/RS/EMT

E.   Ground Two (e):  "Petitioner was denied effective assistance based on counsel's failure to have object [sic], request a hearing, or at a minimum, request the trial court to inquire into the necessity of Stagg wearing a stun belt throughout the entire trial."

Petitioner contends defense counsel was ineffective for failing to object to Petitioner's wearing a stun belt during trial (doc. 1 at 15–19).  He alleges the stun belt, which was secured around his calf, was painful, and left indentations in his leg (*id.* at 18–19).  He alleges the jury was undoubtedly aware he was wearing the stun belt (*id.* at 16).

Respondent contends the state court reasonably found that defense counsel was not ineffective, because Petitioner did not complain about the belt to counsel, and the device was not visible to the jury; therefore, counsel had no basis to object to the belt (doc. 18 at 69–75).

In Petitioner's reply, he alleges he was prejudiced by having to wear the belt, because his desire to hide the belt from the jury caused him to waive his right to be present during the exercise of juror strikes, and to testify on his own behalf (doc. 25 at 14–16).  He also contends it inhibited his communication with counsel, because he feared being "stunned" if the deputy controlling the belt construed any of his behavior as inappropriate (*id.* at 17–18).

1.   Clearly Established Federal Law

Visible shackling of a defendant during a criminal trial is "inherently prejudicial," and may be used only  when "justified by an essential state interest" specific to the defendant on trial.  Deck v. Missouri, 544 U.S. 622, 624, 635, 125 S. Ct. 2007, 161 L. Ed. 2d 953 (2005) (citation omitted). Physical restraints may also interfere with a defendant's Sixth Amendment right to counsel, because "they can interfere with a defendant's ability to participate in his own defense, say, by freely choosing whether to take the witness stand on his own behalf" or by limiting a defendant's ability to communicate with his lawyer.  *Id.*, 544 U.S. at 631; *see also* United States v. Durham, 287 F.3d 1297, 1306 (11th Cir. 2002) ("[A] stun belt imposes a substantial burden on the ability of a defendant to participate in his own defense and confer with his attorney during a trial.").  Here, there is no dispute that the stun device was not visible to thy jury (*see* Ex. L at 943); therefore, prejudice is not presumed, and the Strickland standard applies.  *See* Marquard v. Sec'y for Dep't of Corr., 429 F.3d 1278, 1313–14 (11th Cir. 2005) (requiring a finding of prejudice in a capital case when

considering counsel's effectiveness in relation to the petitioner being required to wear shackles during the penalty phase).

        2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground Three in his Rule 3.850 motion (Ex. K at 625–35). The state circuit court held an evidentiary hearing, after which it adjudicated the claim as follows:

> Regarding the first prong of *Strickland*, the Defendant has alleged that counsel was ineffective for failing to object to or request a hearing on the necessity of the stun device. Neither side disputes that a stun device was placed on the Defendant's calf for the entirety of the trial. However, there was no evidence provided as to why the Defendant was required to wear the device. The Defendant testified that he believed it was "standard operating procedure," and did not know that he had a right to tell his attorney that he didn't want to wear the device. Michael Jacobs, the bailiff who secured the device to the Defendant each day and operated the trigger, speculated that the judge and the lieutenant had determined that the stun device was necessary. Finally, the trial record does not show any objection made by counsel or any hearing regarding the necessity of the stun device.
>
> Trial counsel testified at the hearing that he was aware of case law regarding this issue and knew that he had a right to object to the device or request a hearing on the matter. Further, he discussed this option with the Defendant, and they decided not to raise the issue with the judge. Additionally, trial counsel testified that he specifically told the Defendant that if it caused him any problems at any point to let him know. At no time did the Defendant ever complain about any pain or problems arising from the device. The only instance that trial counsel could relate involving the stun device was related to the Defendant's request not to be present at sidebar during the jury selection, because he did not want to walk in front of the jury with it on his leg. The case law is unclear whether trial counsel can be ineffective for failing to voice an objection, when the Defendant apparently consents to the device or does not voice any concerns to his attorney. Although it appears that trial counsel was not ineffective based on his impression that the device was not hampering the defense, this Court need not decide this issue as the Defendant has failed to demonstrate any prejudice.
> . . . .
> First, the Defendant alleges in his motion that he was prejudiced by not being present at sidebar during jury selection. The Defendant claims that he was not present a[t] sidebar because he did not want to walk in front of the jury with the stun device on his leg. The Defendant states that had [he] been present at sidebar, he would have requested that Juror Hawkins be struck from the panel.

Case No. 5:12cv194/RS/EMT

The record shows that trial counsel was present at sidebar and requested to confer with his client before he made his final jury selection. (*See* Trial Tr. at 120.) At the evidentiary hearing, the Defendant also testified that his attorney consulted with him before choosing the jury. However, the Defendant admits that he never told his attorney that he did not want Juror Hawkins on his jury. He testified that he "missed Juror Hawkins then and when [his attorney] walked away, it was too late." When questioned about whether he ever informed his attorney of this mishap, the Defendant stated that he did not because "it was too late." The Defendant has not proven prejudice, as this Court has already determined in its prior order that an actually biased juror did not serve on his jury. (*See* Order Denying in Part Motion for Post Conviction Relief and Order Directing the State to Respond.) To establish prejudice within the context of a collateral proceeding, the Defendant must show that the juror was in fact biased against the Defendant, and the evidence of bias must be plain on the face of the record. *See Carratelli v. State*, 961 So. 2d 312, 324 (Fla. 2007). Based on Juror Hawkins's affirmance that she would not convict the Defendant unless the State proved its case, the Defendant has not shown that he was prejudiced by an actually biased juror serving on his jury. *See Carratelli v. State*, 915 So. 2d 1256 (Fla. 4th DCA 2005) ("Only where a juror's bias is so clear can a defendant show the necessary prejudice under *Strickland*.").

Secondly, the Defendant states that he was unable to communicate with his attorney because of the fear and pain caused by the stun device. In his motion, the Defendant stated that the device was "originally designed to be worn around the upper arm" and "electrode spikes cut deeply into his calf muscle causing him not only just discomfort, but actual pain . . ." The Defendant also alleges in his motion that he was afraid to make any sudden movements for fear that the bailiff would set off the stun device, as the bailiff had previously threatened him. Additionally, the Defendant testified at the hearing that he was in constant pain that kept him from participating in his defense. He stated that the bailiff had to move the device from one leg to another each day in order to relieve the pain. These allegations were refuted at the evidentiary hearing.

At the hearing, the Defendant's testimony contradicted the allegations raised in his motion, as he admitted there were not spikes but flat electrode buttons on the device. Michael Jacobs pointed out that the device was made to wear on the calf, contrary to the Defendant's allegations. He also stated that he did not recall ever having to move the stun device from one leg to another to alleviate any pain, but it was possible as it had been two years. Mr. Jacob[s] testified that he placed the device on the Defendant each and every day and that he was in control of the trigger throughout the entire trial. He stated that someone may have manned the trigger during a break, but he was the only one with the trigger in the courtroom. He also testified that there was not only a guard to protect against accidental triggers, but there was also a preceding warning beep. He explained the operating procedure to

the Defendant every day and told the Defendant that he would warn him prior to setting off the device. Additionally, Mr. Jacobs stated that he never initiates conversations with any defendants and asserted that he never threatened the Defendant with the stun device. Moreover, trial counsel testified that the Defendant never expressed any of his concerns or pain related to the device. When asked why he never voiced any concerns with his attorney, the Defendant stated that "I didn't bother getting into it no more." The Defendant never voiced any concern to trial counsel, never told counsel that he was in pain, and never told counsel that the device was preventing him from communicating and participating in his defense. Considering the bailiff and trial counsel's testimony as more credible, the Defendant's general allegations that he could not meaningfully participate in his defense are unbelievable, conclusory, and do not establish a reasonable probability that the outcome of the trial would have been different.

Finally, the Defendant alleges in his postconviction motion that he gave up his right to testify because he feared that he would be stunned on the stand if he showed any emotion. These allegations of prejudice are similarly refuted by the testimony at the evidentiary hearing.

The Defendant testified at the evidentiary hearing that he made up his mind to testify in his own defense on Thursday night before the last day of trial. However, the Defendant stated on direct examination that he was so fearful after an incident that occurred with the bailiff on Wednesday that he did not participate in his trial after that point. He continued to state that "the determining factor for me not taking that stand Friday was that stun belt." The Defendant admitted that he did not address his concerns with his attorney or with the Court when he was questioned about waiving his right to testify. Interestingly, trial counsel testified at the evidentiary hearing that the Defendant never told him that he did not to want to testify because of the stun device. In fact, trial counsel reluctantly testified that the real reason the Defendant did not want to take the stand was because he did not want to blame his girlfriend for the murder. Thus, there is a reasonable probability that the Defendant would not have testified regardless of whether the stun device was used. As the Defendant has failed to establish prejudice, his motion is without merit.

(Ex. K at 905–07). Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. N).

Petitioner alleges the stun belt prejudiced his ability to participate in jury selection, because he feared that if he moved from counsel's table to participate in the bench conference during which counsel exercised juror challenges, the jurors would see the stun belt. He alleges this resulted in the seating of an allegedly biased juror, Juror Hawkins. The state court found as fact that defense

counsel consulted with Petitioner at counsel's table before choosing the jury, and Petitioner admitted he never told counsel he did not want Juror Hawkins on the jury. Petitioner has not rebutted these findings with clear and convincing evidence. Further, the findings are supported by the transcript of jury selection (Ex. C) and the testimony at the evidentiary hearing (Ex. L at 952–53, 965–67). In light of the fact that Petitioner had the opportunity to communicate his objection to Juror Hawkins to defense counsel during jury selection but did not, he failed to show that the presence of the stun belt prejudiced him in this regard.

Similarly with Juror Jordan, Petitioner alleges his inability to participate in the bench conference with each juror on the morning of trial regarding each juror's exposure to pre-trial publicity resulted in Juror Jordan's remaining on the jury, even though she admitted she read about the case in the newspaper. As discussed *supra*, Juror Jordan admitted she failed to follow the court's instruction not to read the newspaper, but upon further questioning, she clarified that she did not read the article about Petitioner's case, nor did she obtain any information about the case from her husband or anyone else. Therefore, Petitioner failed to show that his wearing the stun belt had any effect on the composition of the jury.

Petitioner also alleges the stun belt inhibited his communication with counsel, due to the physical pain caused by the device, and his fear that Officer Jacobs would activate the device based upon any behavior he perceived as inappropriate. The state court made several factual findings on this issue, including a finding that the testimony of defense counsel and Officer Michael Jacobs was more credible than Petitioner's assertions regarding the issue of whether the stun belt inhibited Petitioner's ability to participate in his defense.

"Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011); *see also* Gore v. Sec'y for Dep't of Corr., 492 F.3d 1273, 1300 (11th Cir. 2007) (noting that while reviewing court also gives a certain amount of deference to credibility determinations, that deference is heightened on habeas review) (citing Rice v. Collins, 546 U.S. 333, 341–42, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) (stating that "[r]easonable minds reviewing the record might disagree about the [witness'] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination")). Federal habeas courts have "no license to

redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." <u>Marshall v. Lonberger</u>, 459 U.S. 422, 434, 103 S. Ct. 843,74 L. Ed. 2d 646 (1983); *see also* <u>Baldwin v. Johnson</u>, 152 F.3d 1304, 1317 (11th Cir. 1998); <u>Smith v. Kemp</u>, 715 F.2d 1459, 1465 (11th  Cir. 1983) ("Resolution of conflicts in evidence and credibility issues rests within the province of the state habeas court, provided petitioner has been afforded the opportunity to a full and fair hearing.").  Questions of the credibility and demeanor of a witness are questions of fact.  *See* <u>Consalvo</u>, *supra* (citing <u>Freund v. Butterworth</u>, 165 F.3d 839, 862 (11th Cir. 1999) (en banc)).  The AEDPA affords a presumption of correctness to a factual determination made by a state court; the habeas petitioner has the burden of overcoming the presumption of correctness by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e).

At the evidentiary hearing, Officer Jacobs testified that the stun belt was made to wear on the calf, contrary to Petitioner's allegation that it was made to wear on the arm (Ex. L at 977–89).  He testified he placed the device on Petitioner each day, and was in control of the trigger throughout the entire trial.  He also testified that there was not only a guard to protect against accidental triggers, but there was also a preceding warning beep.  He explained the operating procedure to Petitioner every day and told Petitioner that he would warn him prior to activating the device.  Additionally, Officer Jacobs testified he never observed any behavior on Petitioner's part that caused him to think he may have to activate the device, and he denied ever communicating to Petitioner that he considered activating the device.

Defense counsel testified he became aware of the stun belt just prior to jury selection, when the officers put the belt on Petitioner and instructed him on how it worked (Ex. L at 992).  Counsel testified he advised Petitioner they could raise the issue of the necessity of the device with the court, but Petitioner "didn't want to make an issue of it" (*id.* at 993, 1013, 1017, 1020).  Counsel testified that he advised Petitioner to tell him if the stun belt caused him any problems (*id.* at 993, 995, 1016,

1020), and that Petitioner never told him the belt was hurting him or impairing him (*id.* at 995, 998). In light of the credible testimony of Officer Jacobs and defense counsel, Petitioner failed to demonstrate the stun belt interfered with his ability to communicate with counsel or participate in his own defense.

With regard to Petitioner's allegation that the stun belt was the determining factor in his decision not to testify, Petitioner testified at the post-conviction evidentiary hearing that prior to trial, he had decided not to testify (Ex. L at 948). He testified that on Thursday, the evening of the third day of trial (Petitioner's jury selection was on Friday, his trial commenced the following Tuesday, and it concluded that Friday) defense counsel strongly advised him to testify, and he agreed (*id.* at 948–49, 961–62). He testified the two of them spent two hours preparing him to testify (*id.* at 949). Petitioner testified he changed his mind the following morning, and the "determining factor" in his decision not to testify was the stun belt, based upon the alleged incident when Officer Jacobs told him he nearly triggered the device based upon what he perceived as Petitioner's inappropriate behavior on the Wednesday of trial (*id.* at 949–51). Petitioner testified he never told defense counsel he was worried about the stun belt if he testified, nor did he ask counsel to seek removal of the belt during his testimony (*id.* at 962–63). Petitioner also admitted that during the in camera discussion with the trial judge regarding his decision to waive his right to testify, he never mentioned the stun belt, or expressed a desire to testify without it (*id.* at 963–65; *see also* Ex. D at 586–87).

Defense counsel testified Petitioner "flip flopped" several times regarding whether to testify (Ex. L at 999). He testified as of Thursday night, Petitioner decided to testify, but he changed his mind the next morning (*id.* at 999–1001). Defense counsel testified, reluctantly, that Petitioner told him the reason he did not want to testify was that he did not want to blame his girlfriend for the murder (*id.* at 1001, 1005–06). Counsel testified Petitioner never mentioned the stun belt as a reason he did not want to testify (*id.* at 999, 1001).

As previously discussed, the state court did not credit Petitioner's testimony regarding Officer Jacobs's allegedly telling him or threatening that he nearly activated the stun belt on Wednesday. Considering counsel's testimony regarding Petitioner's stated reason for not wanting to testify, and the undisputed evidence that Petitioner had the opportunity to express to defense

counsel and the trial court any concerns about the stun belt in relation to his decision whether to testify, yet Petitioner did not do so, the state court's determination that the stun belt did not prejudice Petitioner's decision whether to testify was not unreasonable.

Petitioner failed to demonstrate that the state court's adjudication of his ineffective assistance of counsel claim, based upon counsel's failure to challenge use of the stun belt, was based upon an unreasonable determination of the facts. He also failed to demonstrate that the state court unreasonably concluded he was not prejudiced by having to wear the stun belt. Therefore, Petitioner is not entitled to relief on this claim. *See* Wrinkles v. Buss, 537 F.3d 804, 823 (7th Cir. 2008) (habeas petitioner failed to demonstrate prejudice from counsel's failure to challenge use of stun belt, where petitioner failed to present any evidence demonstrating the jury saw the stun belt, or that the stun belt affected his abilities to properly participate in his own defense); *see also, e.g.*, Martin v. Sec'y, DOC, 347 F. App'x 485, 494–95 (11th Cir. 2009) (unpublished) (state court did not clearly err in finding that defendant was not prejudiced by defense counsel's alleged ineffective assistance in failing to object to fact that defendant, who was charged with battery on law enforcement officer, was required to wear stun belt under his clothing, and did not reach a decision that was "contrary to" or involved "unreasonable application of" clearly established federal law in denying ineffective assistance of counsel claim that was predicated on attorney's failure to object to use of stun belt; although defendant testified at hearing on his motion for post-conviction relief that the belt affected his decision not to testify and impeded his ability to communicate with counsel, he later acknowledged he decided not to testify to avoid having the jury learn of his extensive prior criminal history; further, defense counsel testified that defendant communicated regularly with him throughout trial and would often offer suggestions; additionally, there was no evidence the belt was visible to jury); Sutton v. Sec'y, Dep't of Corr., No. 6:11-cv-308-Orl-28DAB, 2012 WL 3871867, at *5 (M.D. Fla. Sept. 6, 2012) (unpublished) (state court's denial of petitioner's claim of ineffective assistance of counsel based upon counsel's failure to object to or request a hearing regarding petitioner's wearing a stun belt during trial was entitled to deference, where petitioner's allegations that the stun belt prohibited his participation at trial and prejudiced him at trial were conclusory, and he failed to offer any evidence of how he would have more fully participated in the trial had he not

been required to wear the stun belt, how his participation would have resulted in a different outcome, or how the outcome of his trial would have been different in the absence of a stun belt).

> F.      Ground Two (f): "Petitioner was denied effective assistance and due process as well as equal protection of law, when trial counsel failed to object to the state tendering and the trial court accepting Dr. Charles Siebert as an expert witness, and for failing to present to the jury Siebert's removal as the Bay County Medical Examiner by the Florida Medical Examiner's Commission for honesty and integrity issues."

> Ground Two (g): "Petitioner was denied effective assistance of trial counsel based on counsel's failure to have object [sic] to repeated improper comments made by the prosecutor to the jury during closing arguments.  Petitioner contends that his due process right was violated when the improper comments made by the prosecutor went unchallenged."

Petitioner abandoned these claims (doc. 25 at 18).[12]

## IV.    CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (doc. 1) be **DENIED**.

---

[12] The parties renumbered these claims as Issue II (f), (g) (doc. 18 at 75–80; doc. 25 at 18).

Case No.  5:12cv194/RS/EMT

2.     That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this <u>7</u><sup>th</sup> day of November 2013.


                              /s/ *Elizabeth M. Timothy*
                              **ELIZABETH M.  TIMOTHY**
                              **UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**